[Cite as *State v. McDonald*, 2013-Ohio-4972.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | | C.A. No. 12CA0093-M |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JAMES M. MCDONALD | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | | CASE No. 11 CR 0267 |

DECISION AND JOURNAL ENTRY

Dated: November 12, 2013

---

BELFANCE, Judge.

{¶1} James C. McDonald appeals from his convictions in the Medina County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} In 2011, E.S.[1] told her friends that Mr. McDonald had inappropriately touched her. One of her friends reported the incident to the school counselor, who asked E.S. about the incident. As a result of that conversation, the Medina Police began investigating Mr. McDonald. After hearing about E.S.'s allegation, E.S.'s sister K.S. told her parents that Mr. McDonald had sexually assaulted her six years earlier when she was ten years old. Detective Patrick Sloan investigated the allegations against Mr. McDonald. During his investigation, he learned of a prior report by another girl, C.S., who was unrelated to E.S. or K.S. When C.S. was 11 years

---

[1] E.S. and K.S. changed their last names sometime between when they reported the incidents to the police and the time of trial. Although the indictments and jury forms refer to them by their former names, we refer to them by the names they gave during their testimony.

old, a police report was filed containing allegations that Mr. McDonald had sexually abused her at a time when she was living with her mother and Mr. McDonald in the same home. Detective Sloan contacted C.S., who also testified at trial. Mr. McDonald was indicted for gross sexual imposition, importuning, and two counts of rape. A supplemental indictment charged him with another count of rape against C.S. A jury found Mr. McDonald guilty on all counts, and the trial court sentenced him to an aggregate term of ten years to life in prison. Mr. McDonald has appealed, raising four assignments of error for our review. For ease of discussion, we have rearranged his assignments of error.

II.

ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY OF THE CHARGES BECAUSE THE FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶3} In Mr. McDonald's fourth assignment of error, he argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶4} In reviewing a challenge to the weight of the evidence, the appellate court

[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

**C.S.**

{¶5} The jury found Mr. McDonald guilty of violating R.C. 2907.02(A)(1)(b) as a result of his conduct involving C.S. R.C. 2907.02(A)(1)(b) provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse

of the offender but is living separate and apart from the offender, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

> "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶6} C.S. testified that she lived in Lodi with her mother and Mr. McDonald, who was her mother's boyfriend, as well as with her younger sister and Mr. McDonald's children. C.S. testified that, on June 13, 2001, she was playing in the sprinkler with her sister and Mr. McDonald's children when Mr. McDonald called her to come inside. She watched M*A*S*H with him for a little bit and then Mr. McDonald told her to go into the bedroom he shared with her mother. C.S. was 11 years old at the time.

{¶7} According to C.S., Mr. McDonald joined her in the bedroom and started playing a pornographic video tape for her. Mr. McDonald would pause the pornographic video and describe to her the different female genitalia that were visible on the screen. Mr. McDonald told C.S. he wanted to show her where the genitals were on her body and proceeded to spread her legs. Mr. McDonald moved her swimsuit to the side and inserted at least one finger inside her vagina. While he did this, Mr. McDonald told her, "'This is your clitoris. If you hit this spot this will make you cum.'" C.S. testified that she had never heard those words before and that she was crying because it hurt physically and because she was upset.

{¶8} C.S. testified that, once Mr. McDonald stopped, she ran to her room, "put all [her] dressers in front of [her] door, threw all [her] clothes, everything that was in [her] room, just blocked it in front of the door and called [her] dad." She was screaming and crying while on the

phone to her father. While C.S. waited for her father to come get her, Mr. McDonald "was walking back and forth by [her] door, saying * * * that he was going to hurt [her] mom and hurt [her] sister and hurt [her] * * *." Mr. McDonald also told her "not to say anything [because] nobody's going to believe a child." When her father arrived, C.S. ran out of the house and into his car, locking the door behind her. However, Mr. McDonald was already outside talking to C.S.'s father. While Mr. McDonald spoke with her father, he stared at C.S. in the car.

{¶9} When C.S.'s father got in the car with her, he asked her what was wrong, but C.S. did not want to talk to him about it. However, when they had arrived at her father's house, her father's girlfriend Theresa Saunders[2] could tell something was wrong and made C.S. tell her what had happened. After speaking with the Lodi Police Department and the Sheriff's Office, C.S. went to Akron's Children's Hospital for an examination.

{¶10} C.S.'s father testified that he remembered getting a phone call from C.S. on June 13, 2001, and that C.S. urged him to come get her. From her tone, C.S.'s father assumed that something had happened but did not know what. When he arrived, he spoke with Mr. McDonald, who was sitting on the front steps of the house. While C.S.'s father was speaking with Mr. McDonald, C.S. came running out of house, jumped in the car, and demanded to leave. C.S.'s father drove her back to his house where he lived with Ms. Saunders. During the ride, C.S. would not speak to him, and he assumed she had had an issue with her mother.

{¶11} When they got to the house, C.S. immediately went to her room and stayed there for several hours. C.S.'s father testified that this was unusual behavior for C.S. because she would typically want to watch television or go play with her friends. He went up to her room to

---

[2] Although C.S. referred to Ms. Saunders only as "Theresa," it is clear that she was referring to Ms. Saunders, who also testified in this case.

speak with her, but she refused to talk to him. He eventually left to go to a meeting. On his way to the meeting, he received a call from Ms. Saunders, and he immediately returned home. He called C.S.'s mother, and C.S., her father, her mother, and Ms. Saunders went to the police station. The police directed them to the Sheriff's Department. According to C.S.'s father, while C.S.'s mother and Ms. Saunders took C.S. to the Sheriff's Department, he went to Mr. McDonald's house to confront him. When he got there, he "got out of the car and chased [Mr. McDonald] around[ and] told him to 'get out of here.'"

{¶12} Ms. Saunders testified that, when C.S.'s father brought her home, C.S. "was not herself. She was * * * hysterical * * *." Ms. Saunders repeatedly asked C.S. what was wrong, and C.S. eventually told her that Mr. McDonald had touched her in a sexual manner. She called C.S.'s father to tell him what happened, and he returned to the house. Ms. Saunders testified that she did not go to the police station with C.S. and her parents.

{¶13} Donna Abbott testified that she was a nurse practitioner who worked at the CARE Center, the Akron Children's Hospital child-abuse clinic. Ms. Abbott testified that she examined C.S. on June 19, 2001. Ms. Abbott did not make any significant physical findings following her examination of C.S. According to Mr. Abbot, that was not unusual. She explained,

> It's a common misconception that whenever any type of penetration into the vaginal area occurs that * * * there's something that abrades or tears * * *. The body is made to allow for things like that to happen, even in very young girls. So, when a child describes some type of penetration into the vaginal area, it is highly unusual to see any kind of abnormality, damage, [or] injury * * *.

Ms. Abbott also explained that she had examined C.S. six days after C.S. claimed the incident with Mr. McDonald had occurred and that the passage of time would also lessen the likelihood of there being physical signs of trauma.

**{¶14}** Tad Davis testified that he worked as a deputy sheriff for the Medina County Sheriff's Office in 2001 and that he investigated the allegation involving C.S. and Mr. McDonald. Agent Davis[3] spoke with Mr. McDonald on the night of the incident. During that interview, Mr. McDonald told Agent Davis that C.S. had been outside playing with his children but she came inside around 3:00 or 3:30 p.m. and the two of them watched a movie. Mr. McDonald told Agent Davis that C.S. had called someone and that her father had come to get her; however, he denied ever telling her to go into the bedroom or having touched her.

**{¶15}** Mr. McDonald argues that his conviction for raping C.S. is against the manifest weight of the evidence because there a significant delay of more than ten years from the time C.S. accused Mr. McDonald of molesting her and when the case came to trial. Mr. McDonald also points to the fact that Agent Davis testified that a written statement from Mr. McDonald at the time of the accusation appeared to have been lost. However, Mr. McDonald's attorney cross-examined multiple witnesses extensively about the delay in prosecuting the case, meaning the jury was well aware that more than ten years had passed and could factor that into its consideration of what weight to give the testimony. Similarly, the jury was aware that Mr. McDonald's written statement was missing. Given Mr. McDonald's limited arguments and after a thorough review of the record, we cannot conclude that the jury lost its way when it found that Mr. McDonald had violated R.C. 2907.02(A)(1)(b) by engaging in sexual conduct with C.S. when she was less than 13 years old.

---

[3] Mr. Davis identified himself in the record as an agent with the Medina County Drug Task Force, and, therefore, we identify him by that title.

**E.S. and K.S.**

{¶16} The jury found that Mr. McDonald, through his actions towards E.S., violated R.C. 2907.05(A)(1) by committing gross sexual imposition and former R.C. 2907.07(B) by committing importuning. R.C. 2907.05(A)(1) provides that

> [n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

Sexual contact is "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). Former R.C. 2907.07(B) provided,

> No person shall solicit another, not the spouse of the offender, to engage in sexual conduct with the offender, when the offender is eighteen years of age or older and four or more years older than the other person, and the other person is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of the other person.

{¶17} The jury also found Mr. McDonald guilty of violating R.C. 2907.02(A)(1)(b) and R.C. 2907.02(A)(2) by his actions towards K.S. R.C. 2907.02(A)(1)(b) provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶18} E.S. testified that she visited her grandparents, who lived in Medina, nearly every-other weekend as well as most of the summer. She became friends with Mr. McDonald's daughter and spent a lot of time at Mr. McDonald's house. On April 30, 2011, when she was 13, she rode her bike from her grandparents' house to Mr. McDonald's house to see if S.M. was home. Mr. McDonald answered the door and told E.S. that S.M. was not home. He came outside to show E.S. the garden in his front yard. They then went to the garage where Mr. McDonald offered E.S. a drink.

{¶19} According to E.S., while she was in the garage with Mr. McDonald, he asked her what she wanted to be when she grew up. E.S. told him that she wanted to be a model, and Mr. McDonald told her that she had the body for it. Mr. McDonald proceeded to run his hand up her leg to E.S.'s buttock, grabbing it and saying "'You have a firm butt.'" He asked her if she had "ever got fingered," which made E.S. uncomfortable, and she started to move away from him. Mr. McDonald also asked if E.S. had ever had an orgasm and asked if "he could show [her] one[.]" E.S. told Mr. McDonald, "'[N]o," and acted like she had a text message from her grandfather telling her to come home. She left and told her grandparents that she did not feel comfortable at Mr. McDonald's house but did not tell them what had happened.

{¶20} While E.S. did not tell her grandparents, her mother or her stepfather what had happened, she did tell her best friend Josh and her neighbor. In May, E.S. was called to the counselor's office at school because someone had informed the school about the incident. The school called E.S.'s mother, and they went directly to the police station.

{¶21} E.S.'s mother testified that, after E.S. had spoken to the police, she and her husband were discussing the situation when K.S. entered the room and asked what they were talking about. They told K.S. that E.S. had been inappropriately touched by someone, and K.S.

asked if it was Mr. McDonald. E.S.'s mother asked K.S. why she thought it was Mr. McDonald, and K.S. told her that Mr. McDonald had behaved inappropriately towards her many years earlier. However, on cross-examination, E.S.'s mother admitted that she did not remember for sure if K.S. had mentioned Mr. McDonald before or after she had heard that E.S. had accused him.

{¶22} K.S. testified that she was born March 12, 1995. K.S. testified that she was friends with Mr. McDonald's daughter who was a few years younger than her. When she was ten years old, K.S. rode her bike with E.S. to Mr. McDonald's house to visit his daughter. However, Mr. McDonald was the only person home. He invited K.S. inside for a drink, and she accepted while E.S. remained out in the driveway.

{¶23} When K.S. came into the house, Mr. McDonald touched her buttocks and hugged her from behind. He told K.S. to go into the living room and to sit in a chair, which she did. Mr. McDonald asked, "'Do you know where babies come from?'" K.S. said that she thought so. Mr. McDonald began pulling K.S.'s shorts down and inserted his middle finger in her vagina. He told K.S., "'If you tell anybody, I'm going to come after you.'" K.S. told him to stop, and he did. She pulled up her shorts and ran out of the house.

{¶24} When K.S. got outside, she told E.S. that they needed to go. E.S. did not want to leave, so K.S. suggested that they go on a bike ride with Mr. McDonald's daughter. While they were riding, E.S. asked K.S. what was wrong, but K.S. told her that she would tell her later. After the bike ride, K.S. and E.S. went back to their grandparent's house. K.S.'s grandmother asked what was wrong, but K.S. told her that nothing was wrong. K.S. did not tell her parents either. However, five years later, K.S. told J.H., whom she was dating at the time.

**{¶25}** J.H. testified that, in July 2010, K.S. had told him that she had gone to Mr. McDonald's house and that he had "fingered" her. He also testified that he had gone trick-or-treating with K.S. that year and that they had run into Mr. McDonald. According to J.H., K.S. introduced him to Mr. McDonald and then told J.H. that Mr. McDonald was the man who had molested her.

**{¶26}** Mr. McDonald's daughter testified in his defense and told the jury that she had never seen Mr. McDonald alone with either K.S. or E.S. and that she had never seen either of them upset at her father's house. The friend of Mr. McDonald's daughter who lived across the street from the McDonalds' house also testified in support of Mr. McDonald. Like Mr. McDonald's daughter, her friend testified that she had never seen K.S. or E.S. alone with Mr. McDonald and had never observed them upset while they were at Mr. McDonald's house.

**{¶27}** After a thorough review of the record, we cannot say that Mr. McDonald's convictions for gross sexual imposition and importuning are against the manifest weight of the evidence. E.S. testified that Mr. McDonald touched her buttocks, which could be viewed as sexual contact, and that he had asked if he could show her what an orgasm was. Mr. McDonald argues that the jury should have disregarded E.S.'s testimony, however, because she sent 50 text messages around the time of the alleged incident without mentioning the incident. Essentially, Mr. McDonald argues that, if E.S.'s testimony were true, E.S. would have certainly texted someone about the incident at the time. Although Mr. McDonald challenges E.S.'s credibility, this Court has repeatedly acknowledged, the trier of fact is in the best position to judge the credibility of witnesses. *See, e.g., State v. Campanalie*, 9th Dist. Summit No. 26383, 2013-Ohio-3509, ¶ 21. The jury was aware of the text messages and could weigh the issue, in addition to assessing the demeanor and credibility of all of the witnesses. In weighing all of the evidence

and resolving credibility, to the extent the jury believed E.S.'s testimony, we cannot say that it clearly lost its way.

{¶28} K.S. testified that Mr. McDonald digitally penetrated her, that he refused to stop despite her repeated pleas that he do so, and that she was ten years old at the time. However, Mr. McDonald argues that K.S.'s testimony was not credible because she only reported the incident after she had heard of E.S.'s allegations against him. He also points to K.S.'s testimony that he had apparently committed this act against her a week after an unrelated attempted kidnapping. He argues that K.S.'s grandparents would certainly not have allowed her to bike with her sister to his house alone so soon after that incident. He also argues that the fact that K.S. had no problem reporting the attempted kidnapping undermines her credibility that she did not feel comfortable immediately reporting this incident with him. However, Mr. McDonald's counsel thoroughly cross-examined K.S. on these facts, and, thus, the jury was well aware of the potential credibility issues. After a thorough review of the record, we cannot say that the jury lost its way or committed a manifest miscarriage of justice when it found Mr. McDonald had engaged in sexual conduct with K.S. when she was under the age of 13 or that he had engaged in sexual conduct with her through force.

{¶29} Mr. McDonald's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED WHEN IT REFUSED TO SEVER THE CHARGES AGAINST THE APPELLANT[.]

{¶30} Mr. McDonald argues in his third assignment of error that the trial court should have severed the charges. We disagree.

{¶31} "The law favors joining multiple criminal offenses in a single trial[.]" *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991). However, "[i]f it appears that a defendant * * * is

prejudiced by a joinder of offenses * * * in an indictment, * * * the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires." Crim.R. 14. To prevail on a motion to sever, a defendant has the burden of demonstrating three facts:

> (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.

*State v. Schaim*, 65 Ohio St.3d 51, 59 (1992). "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *Id*.

{¶32} Mr. McDonald argues that he was prejudiced by the joinder of the charges in this case because it permitted the jury to hear other-acts evidence that would not have otherwise been admissible under Evid.R. 404(B). However, Mr. McDonald does not develop any argument about whether the evidence was simple and distinct. *See* App.R. 16(A)(7). Even assuming that Mr. McDonald is correct as to the inadmissibility of other acts evidence, he would then have to demonstrate that the evidence about the different charges was not simple and distinct. *See Schaim* at 59. *See also State v. Lott*, 51 Ohio St.3d 160, 163 (1990) ("[W]hen simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)."). Furthermore, Mr. McDonald has not argued that he provided the trial court with sufficient evidence at the time of his motion from which it could determine that he was prejudiced by the joinder. *Schaim* at 59. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) (stating that it is not the duty of the appellate court to create arguments for the appellant).

**{¶33}** Accordingly, given Mr. McDonald's limited appellate arguments, his third assignment of error is overruled.

ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ALLOWED THE TESTIMONY OF DONNA ABBOTT, NURSE PRACTI[TI]ONER[,] TO PROVIDE EXPERT OPINION REGARDING THE SEXUAL ABUSE OF [C.S.].

**{¶34}** Mr. McDonald argues that the trial court committed plain error when it allowed Ms. Abbott to testify about the findings of her physical examination of C.S. and to state whether those findings surprised her. We disagree.

**{¶35}** Because Mr. McDonald never objected to Ms. Abbott's testimony, we review the admission of the testimony for plain error. *See* Crim.R. 52(B). To establish plain error,

"[f]irst, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights [ ]' [to the extent that it] * * * affected the outcome of the trial."

*State v. Hardges*, 9th Dist. Summit No. 24175, 2008-Ohio-5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). However, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶36}** Mr. McDonald initially argues that, because the State never sought to have Ms. Abbott declared to be an expert witness, she should not have been able to offer the expert opinion testimony that her examination of C.S. revealed no significant physical findings. Assuming for the sake of argument that Ms. Abbott should have been qualified as an expert

witness prior to giving that testimony,[4] it is difficult to see how Mr. McDonald was prejudiced by testimony that there was no physical evidence supporting C.S.'s accusation. *See* Crim.R. 52(A). Under the circumstances, we certainly cannot conclude that the admission of this testimony rose to the level of plain error.

{¶37} Mr. McDonald also argues that Ms. Abbott impermissibly bolstered C.S.'s credibility by indicating that she was not surprised by the lack of physical trauma. The crux of Mr. McDonald's argument is that, because Ms. Abbott was an expert, the jury was more likely to give weight to her opinion about C.S.'s credibility. We initially note that Ms. Abbott did not comment on C.S.'s credibility; rather, she commented that the lack of physical evidence did not surprise her. Furthermore, as Mr. McDonald pointed out, Ms. Abbott was never found to be an expert by the trial court and was not represented as such to the jury. *See Horton* at ¶ 7 (noting that declaring a witness an expert in front of the jury likely bolsters their credibility). Regardless, under the circumstances, to the extent an error occurred, the error did not rise to the level of a plain error.

{¶38} Mr. McDonald's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED WHEN IT ALLOWED THE HEARSAY TESTIMONY OF [J.H.] TO BE ADMITTED INTO EVIDENCE AT TRIAL[.]

{¶39} In Mr. McDonald's second assignment of error, he argues that J.H. should not have been permitted to testify that K.S. had told him that Mr. McDonald had sexually assaulted her because the testimony constituted inadmissible hearsay. We disagree.

---

[4] Mr. McDonald does not argue that Ms. Abbott does not qualify as an expert or attempt to explain why a registered nurse who has worked in the CARE Center of Akron Children's Hospital for 20 years would not be qualified to testify about the findings of a physical examination. *See State v. Horton*, 9th Dist. Summit No. 26030, 2012-Ohio-3340, ¶ 4-6.

**{¶40}** As a general rule, hearsay is inadmissible. *See* Evid.R. 802. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). However, a prior statement is not hearsay if it is not offered in evidence to prove the truth of the matter asserted.

**{¶41}** In this case, Mr. McDonald's counsel cross-examined K.S. and her mother about K.S.'s initial accusation about Mr. McDonald. The cross-examination clearly implied that K.S. had fabricated her claim against Mr. McDonald after hearing about her sister's allegations. However, K.S. testified that she had previously told her boyfriend J.H. that she had been sexually abused by Mr. McDonald. J.H. testified that, in July 2010, K.S. had told him that she had gone "over to Mr. McDonald's house[] and that she had got fingered by him." The trial court immediately told the jury,

> I'm going to give you a limiting instruction for this testimony right now. The testimony isn't to be used by you to determine whether or not that's the truth of the matter; that is to say, that that actually occurred. What it's to be used by for you is – remember, this is the young woman who disclosed apparently after she heard about her sister a year later, right? So not in 2010, but in 2011. The testimony is that she overheard her parents talking about the sister and then she came forward, if you believe that child, and told her parents that that occurred.
>
> This testimony is not being used to prove the matter or not, but to show that she had made a statement – or allegedly made a statement to somebody prior to that time, and only for that purpose.

**{¶42}** While Mr. McDonald argues that the trial court's instruction "addresses no exception to the Hearsay Rule[,]" the statement made by J.H. was not hearsay. *See* Evid.R. 801(C). As reflected by the trial court's instruction to the jury, J.H.'s testimony was not offered to prove that Mr. McDonald sexually molested K.S.; rather, it was offered to prove that she made

a statement to J.H.[5]    Accordingly, the statement was not hearsay, and the trial court did not err in allowing J.H.'s testimony about the statement.

**{¶43}**  Mr. McDonald's first assignment of error is overruled.

### III.

**{¶44}**  Mr. McDonald's assignments of error are overruled, and the judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

---

[5] The testimony also appears to fall directly within the purview of Evid.R. 801(D), which provides that a statement is not hearsay if "[t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive * * *."

Costs taxed to Appellant.

                                          _____

EVE V. BELFANCE
FOR THE COURT

MOORE, P. J.
WHITMORE, J.
CONCUR.

APPEARANCES:

CONRAD G. OLSON, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.